**KUSTOM SIGNALS, INC., Plaintiff,**

v.

**APPLIED CONCEPTS, INC. and John L. Aker, Defendants.**

**No. CIV. A. 96–2296–KHV.**

United States District Court, D. Kansas.

June 13, 1999.

As Amended June 29, 1999.

Michael Yakimo, Jr., D. A. N. Chase, Ginnie C. Derusseau, Chase & Yakimo, Overland Park, KS, for Plaintiff.

Douglas R. Richmond, Gerald A. King, Thomas H. Stahl, Armstrong Teasdale LLP, Kansas City, MO, Ronald Craig Fish, Falk, Vestal & Fish, Morgan Hill, CA, for Defendants Applied Concepts, Inc., John L. Aker.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

Plaintiff Kustom Signals, Inc. ("Kustom") has filed suit against Applied Concepts, Inc. and John L. Aker, alleging that they infringed its patent for a police traffic radar. This matter is before the Court on *Defendants' Motion For Summary Judgment On The Issue Of Validity Of The '246 Patent* (Doc. # 116) filed February 26, 1999; *Defendants' Motion For Summary Judgment On The Issue Of Infringement Of The '246 Patent* (Doc. # 119) filed February 26, 1999; *Plaintiff's Motion For Summary Judgment Of Infringement Of U.S. Patent No. 5,528,246* (Doc. # 122) filed March 1, 1999; and *Plaintiff's Cross Motion For Summary Judgment Of Validity Of The '246 Patent* (Doc. # 130) filed March 24, 1999. The Court held oral argument on the above motions on May 3, 1999. After carefully considering the record evidence and arguments of counsel, the Court is prepared to rule. For the reasons set forth below, defendants' motion for summary judgment on non-infringement is sustained, plaintiff's motion for summary judgment on patent validity is sustained in part, and all other motions are overruled.

### Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1538–39 (10th Cir.1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. A "genuine" factual dispute requires more than a mere scintilla of evidence. *Id.* at 252, 106 S.Ct. 2505.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hicks v. City of Watonga*, 942 F.2d 737, 743 (10th Cir.1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l,*

*Inc. v. First Affiliated Secs., Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir.1991). The nonmoving party may not rest on its pleadings but must set forth specific facts. *Applied Genetics*, 912 F.2d at 1241.

"[W]e must view the record in the light most favorable to the parties opposing the motion for summary judgment." *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.*, 938 F.2d 1105, 1110 (10th Cir.1991). Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. *Anderson*, 477 U.S. at 250–51, 106 S.Ct. 2505. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir.1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505.

### Factual Background

The following facts are uncontroverted or deemed admitted for purposes of the instant motions.[1]

Kustom alleges that Applied Concepts, Inc. ("ACI") and John L. Aker infringed its patent for a police radar, specifically U.S. Patent No. 5,528,246 (the " '246 patent" or " '246 radar"). Defendants deny infringement and allege that the patent is invalid. ACI manufactures and sells the accused traffic radars, the Stalker Dual and the Stalker Dual SL. Aker, an ACI shareholder, designed the software that controls the operation of the digital signal processor ("DSP") in the accused radars. Pursuant to an agreement with ACI, Aker receives royalties on Stalker Dual sales.

### A. Background Of Doppler Police Radars

In the context of traffic surveillance, Doppler police radars emit signals that bounce off surfaces in front of the radar. These surfaces include target vehicles, immobile roadside objects such as signs, the ground, and even the fan in the patrol car engine. The bounced signals return to the police radar, where a receiver detects and reads them. *See Defendants' Memorandum In Support Of Their Motion For Summary Judgment On The Doctrine Of Equivalents* (Doc. # 120) filed February 26, 1999, Statement Of Uncontroverted Facts ("ACI's Infr. SOF") ¶ 1. The returning radar signals have a different frequency from the outgoing signals because of the "Doppler effect." The Doppler effect causes a shift in frequency which is proportional to the relative speed between the police radar and the object from which the signal bounced. To determine target speed, the radar first determines the frequency of the target return signal; it then determines the speed, if any, that the radar in the patrol car is traveling; it finally measures the Doppler shift between the two. The higher the frequency shift, the faster the target. A search for the radar return with the highest frequency is called

---

**1.** Defendants cite factual determinations by the Honorable Earl E. O'Connor, in connection with defendants' earlier summary judgment motion, and argue that they constitute the law of the case pursuant to Fed.R.Civ.P. 56(d). Defendants ignore Judge O'Connor's clear prefatory statement that the stated facts were "[f]or purposes of defendants' motion." *Kustom Signals, Inc. v. Applied Concepts, Inc.*, 995 F.Supp. 1229, 1231 (D.Kan.1998). Judge O'Connor made no specific findings of fact pursuant to Rule 56(d). *Cf. In re Independent Servs. Orgs. Antitrust Litig.*, 964 F.Supp. 1469, 1476 (D.Kan.1997) (Judge O'Connor noted that "[p]ursuant to Rule 56(d) of the Federal Rules of Civil Procedure, the court finds that the following facts exist without substantial controversy and thus will be deemed established at trial of this action").

a "fastest search," *i.e.* a search for the fastest target. *See id.* ¶ 2.

Some of the return signals do not represent real targets, because many phenomena can create high frequency return signals. For example, radar signals can double and triple bounce between the patrol car and roadside signs or other vehicles and cause a false target at double or triple the relative closure speed. Also, strong signals in the spectrum can generate harmonics far greater than their true frequency. Further, multiple strong return signals can mix. This can cause "intermodulation products" which read as false targets. *See id.* ¶ 3.

One way to screen false targets is to measure the "amplitude" of the return signal. Amplitude is sometimes referred to as the "magnitude" or "strength" of the signal. Amplitude can indicate both the size and the distance of the object which reflects the signal, the angle of the surface which reflects the radar beam, and the material from which the object is made. For example, a tractor-trailer rig typically has a higher amplitude signal than most roadside objects. Because many of the phenomena that cause high frequency false targets have low amplitudes, Doppler radar can use an amplitude measurement to screen out signals that do not meet a minimum threshold. In police radar parlance, the highest amplitude signal is called the "strongest" signal. *See id.* ¶ 5.

Police officers cite traffic violators for speeding based on "tracking history." Tracking history includes visual observation of the various vehicles which are in view of the officer, visual estimates of target vehicle speed, and all other information available to the officer. Police use radar to verify their visual estimates of vehicle speed. *See id.* ¶ 6.

In most states, to secure a conviction for a speeding offense based on radar evidence, the officer must confirm the radar target display speed by visual estimate, and the displayed speed must be the speed of the strongest signal which the radar has detected. Accordingly, before 1994, most police radars automatically selected the strongest radar return signal and displayed its speed in a target speed display window. Reliance on a strongest search can be limiting, however, if a smaller, faster vehicle is very close to a slower, larger vehicle that reflects a stronger signal. *See id.* ¶ 7. Also, a search for the strongest signal does not eliminate problems of misidentification. The return signal that is strongest may not be the target the officer is looking at, and the closest vehicle does not always generate the strongest signal. For example, a truck with a large radar cross-section that is half a mile away can generate a stronger radar return than a car with a small radar cross-section that is only a quarter of a mile away. Further, a distant car with a small radar cross-section can generate a "glint" if the radar beam strikes the car surface at a particular angle relative to the radar beam. The glint signal can be stronger than the signal from another vehicle that is both closer to the radar and has a larger radar cross-section. *See id.* ¶ 8.

## B. Background Of Fast Fourier Transform Processing

In 1990, ACI introduced the Stalker police radar. *See id.* ¶ 10. The Stalker employed a mathematical technique known as digital Fast Fourier Transform ("FFT") processing. *See id.* ¶ 11. The Stalker radar digitized the analog radar return signals and then performed an FFT on the samples. *See id.* ¶ 12. By performing an FFT, complex analog signals can be transformed into a frequency domain representation, each component having a different frequency (indicating target speed) and amplitude (indicating target signal strength). The resulting collection of single frequency components is called a "spectrum" of Fourier components. In FFT parlance, each single frequency component is called a "bin" and each bin has an index which represents its frequency. *See id.* ¶ 13. This technique permits complex digital signal processing to verify that each bin fits certain acceptance criteria.

If a bin does not fit certain threshold criteria, the radar disregards it as a false target. It also allows the bins to be sorted by strength (strongest search). By 1994, the bins also could be sorted by frequency (fastest search). Digital FFT Doppler police radars are more sensitive than older analog radars, so speeders can be detected at a greater distance. *See id.* ¶ 14.

## C. Kustom's Development Of The '246 Patent

By July 25, 1991, the inventors conceived the invention of the '246 patent set forth in claims 1, 3, 6, 16, 17 and 20. *See Memorandum In Support Of Plaintiff's Motion For Summary Judgment Of Infringement Of U.S. Patent No. 5,528,246* (Doc. #123) filed March 1, 1999, Statement Of Facts ("Kustom's Infr. SOF") ¶ 3. In October 1993, Kustom introduced for sale to the public its Eagle series of FFT radars with fastest or strongest capability. That month, it distributed at an International Association of Chiefs of Police Convention in St. Louis, Missouri an Eagle brochure which advertised the fastest function. *See* Kustom's Infr. SOF ¶ 7; ACI's Infr. SOF ¶ 30. Until that time, defendants did not realize that the market would support a traffic radar with a fastest function. *See id.* ¶ 9. Eight months later, on June 14, 1994, the National Highway Traffic Safety Administration ("NHTSA") approved use of fastest technology. *See* ACI's Infr. SOF ¶ 32.

On June 30, 1994, Kustom submitted an application to the Patent and Trademark Office ("PTO") for the '246 patent, a traffic radar with a digital signal processor ("DSP"). The application contained 21 claims, and the PTO rejected all of them for obviousness. On June 5, 1995, Kustom filed an amended patent application which deleted the original claims and added 21 new ones. On June 18, 1996, the PTO issued the '246 patent to Kustom as the sole owner of the patent by assignment from the inventors, Richard L. Henderson, John M. Kusek and Donald R. Bradrick. The '246 patent discloses a traffic radar device which processes Doppler return information in an effort to improve target identification and minimize interference and unwanted harmonics.

For convenience in discussing the patent claims, the Court has added paragraph letters to those claims in the original and amended '246 patent which did not include them.

Original independent claim 1 of the '246 patent disclosed:

A method of processing Doppler return information in a traffic radar comprising the steps of:

(a) receiving Doppler return information containing at least one return signal derived from a target vehicle,

(b) presenting said Doppler return information as digital data,

(c) transforming said data into the frequency domain to provide a spectrum that includes frequency components corresponding to Doppler return signals contained in said information,

(d) validating said frequency components present in said spectrum by determining if each component has a greater magnitude than an average magnitude representative of the sensitivity of the spectrum, and

(e) determining the magnitude and frequency of each valid component.

New claim 1 did not include original clauses (d) and (e) but added the following:

(d) storing said components in a memory,

(e) searching said components in memory for the component that meets preselected magnitude or frequency criteria, and

(f) indicating the speed of the target vehicle corresponding to the component that meets said criteria.

Original independent claim 16 disclosed:

In a traffic radar, apparatus for processing Doppler return information comprising:

(a) means for receiving Doppler return information containing at least one return signal derived from a target vehicle, and for presenting said information as digital data,

(b) means for transforming said data into the frequency domain to provide a spectrum that includes frequency components corresponding to Doppler return signals contained in said information,

(c) means for determining if each of said components has a greater magnitude than an average magnitude representative of the sensitivity of the spectrum, whereby to validate those frequency components having said greater magnitude, and

(d) means for determining the magnitude and frequency of each valid component and retaining the same in memory.

New claim 16 did not include original clauses (c) or (d) but added the following:

(c) memory means for storing said components,

(d) means for searching the components stored in said memory means to identify the component that meets preselected magnitude or frequency criteria, and

(e) means responsive to the identified component for indicating the speed of the target vehicle corresponding thereto.

Original independent claim 20 disclosed:

In a traffic radar, apparatus for processing Doppler return information comprising:

(a) means for receiving Doppler return information containing at least one return signal derived from a target vehicle, and for presenting said information as digital data,

(b) means for transforming said data into the frequency domain to provide a spectrum that includes frequency components corresponding to Doppler return signals contained in said information,

(c) means for determining the magnitude and frequency of each of said components,

(d) search means for providing a plurality of modes of operation, including a mode in which a target vehicle component of greatest magnitude is identified and a mode in which a target vehicle component of highest frequency is identified, and

(e) means under operator control for selecting either a greater magnitude or highest frequency search, whereby either strongest signal or fastest signal target identification is provided.

New claim 20 is similar to the original claim 20 but adds clause (c1) and slightly modifies clause (d):

(c1) memory means for storing said components,

(d) search means for providing a plurality of modes of operation, including a mode in which a target vehicle component of greatest magnitude in said memory means is identified and a mode in which a target vehicle component of highest frequency in said memory means is identified.

The '246 patent specification provides six processing modes of operation under operator control: (1) stationary mode, strongest signal; (2) stationary mode, fastest signal; (3) moving mode, opposite direction, strongest signal; (4) moving mode, opposite direction, fastest signal; (5) moving mode, same direction (same lane), normal processing; and (6) moving mode, same direction (same lane), slower target processing. *See* ACI's Infr. SOF ¶ 35.

The '246 patent specification also discloses a spectrum validation process which receives the frequency components generated by the FFT process (*see* Figure 17) and computes an average that represents the sensitivity of the spectrum. *See* '246 flow chart, Fig. 18; *Memorandum In Support Of Defendants' Motion For Summary Judgment On The Issue Of Validity Of*

*The '246 Patent* (Doc. # 117) filed February 26, 1999, Statements Of Uncontroverted Facts ("ACI's Validity SOF") ¶ 39. This process does not vary from one operating mode to another. Generally speaking, the spectrum validation process subjects the frequency components to various criteria to remove noise and harmonics and ranks the remaining components by strength and speed to identify the strongest and fastest candidates. *See* Kustom's Infr. SOF ¶ 13. After the FFT transform is performed, a working copy of the FFT spectrum is made. *See* '246 flow chart, Fig. 18, box 14. Based upon an operator selected range value, a range factor (from one to six) is then read from data supplied by the microcontroller unit ("MCU"). The number of frequency (target speed) components in the averaged spectrum received from the FFT is then set into a loop counter to establish the maximum number of times the processing loop of Figure 18 will be performed. Next, by averaging the magnitude of the frequency component and the magnitudes of its 32 neighboring frequency components, a 33 point moving average is calculated around each frequency component. This moving average establishes a local noise floor for every peak that represents the average magnitude of the background noise in the vicinity of each frequency component. The 33 point moving average and the range factor are then multiplied. This calculation establishes the threshold or minimum level of magnitude a frequency component must have, if it is to be allowed into the spectrum that will be searched. The magnitude of each frequency component is then compared to this threshold or minimum magnitude level. Any frequency component with a magnitude that is less than the minimum is set to zero, thereby eliminating it from the spectrum to be searched. The effect of this adjustment is to eliminate those frequency components which represent noise peaks such as peaks resulting from roadside signs, grass, dirt or the roadway pavement itself. *See id.* ¶ 36.

The spectrum validation steps of Figure 18 do not transform digital data into the frequency domain. *See id.* ¶ 37. Rather, the FFT process of Figure 17 converts the digital data encoding the Doppler signal into frequency components of a Fourier spectrum in the frequency domain. *See id.* ¶ 38.

After the spectrum validation process and moving average examination, the '246 radar reads the fastest/strongest flag. In any fastest mode, the '246 radar conducts a top down search of an array of frequency components that have been sorted by descending order of index or frequency. The radar sets a pointer at the highest frequency component in the sorted array, reads its amplitude and index/frequency, and determines if that component has a zero magnitude. If the frequency component has a nonzero magnitude, the '246 radar determines if its index/frequency is within limits. The first frequency component that has a nonzero amplitude and an index that is within limits is accepted as the fastest target. If the frequency component either has a zero amplitude or its index is outside of limits, the pointer is moved down to the next lower frequency bin in the array and the process starts again (to prevent a display of obviously ridiculous speeds). *See* ACI's Validity SOF ¶ 45. The first frequency component in the array with a nonzero amplitude and an index within limits will be the target selected as the fastest target. *See id.* ¶ 46. In any strongest mode, the '246 radar conducts a similar top down search of an array of frequency components that have been sorted by descending order of magnitude.

Kustom intended that the '246 patent would cover its Eagle series radars. Its Golden Eagle radar manual, copyright 1993, states that the fan interference filter may be turned off, apparently for those vehicles that do not generate detectable fan noise. The '246 patent states that the only significant tradeoff of the periodic noise search is that the radar may not recognize a target with a frequency which is essentially equal to one of the harmonics.

## D. Claim Construction

Pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996), Judge O'Connor made the following claim construction findings: (1) the term "or" as used in claims 1(e), 16(d) and 20(e) means "a choice between either one of two alternatives, but not both;" (2) the term "criteria" in claims 1(e), 1(f), and 16(d) means "standards used to search and find a single fastest or strongest target, depending on the mode selected by the operator;" and (3) the term "preselected" in claims 1 and 16 means "a selection of criteria which have been programmed into the software and cannot be altered by the operator." *See Kustom*, 995 F.Supp. at 1236–38.

## E. Comparison Of Operation Of The '246 Radar And The Stalker Dual Radars

ACI added the fastest function to its Stalker Dual radars in 1994. In the Stalker Dual, the FFT spectrum processing does not vary based on the operator's selection of strongest or fastest mode. As with the '246 patent, the spectrum validation process subjects the frequency components to various criteria to remove noise and harmonics and ranks the remaining components by strength and speed to identify the strongest and fastest candidates. *See* Kustom's Infr. SOF ¶ 14.

In separate windows, the Stalker Dual simultaneously displays both the strongest target and the fastest target. The '246 radar has only one target window, where it displays either the strongest target speed or the fastest target speed. In Stalker Dual radars, the fastest target speed goes blank when the fastest vehicle becomes the strongest target; the number which represents miles per hour appears to "move" from the fastest target display window to the strongest target display window. *See* ACI's Infr. SOF ¶ 82. Based on the same set of data, Stalker Dual radars can search and display both the strongest and fastest targets. In the '246 radar, the radar must collect new data if the operator switches from fastest to strongest mode or vice versa. *See id.* ¶ 41. In strongest mode, Stalker Dual radars do not complete the identification of the fastest target vehicle or display any information regarding it.

When the Stalker Dual is in fastest mode, it will not select a fastest candidate unless a valid strongest target is displayed and the fastest candidate is at least one unit greater than the strongest target. *See id.* ¶¶ 43, 81. In this respect it is unlike the '246 radar. The difference in structure and operation between the Stalker Dual and the '246 radars frequently leads to different results in the same traffic situation. *See id.* ¶ 79. Two different noise-to-signal ("N/S") acceptance criteria are used as initial screens, and these N/S ratios are picked from a table among multiple tables. The operator sensitivity selection and the patrol speed control the particular table which these N/S ratio acceptance ratios are derived. Stalker Duals find the fastest target by testing the N/S ratios of the fastest candidates, starting with the fastest. The first fastest candidate that passes both N/S tests is selected for further screening to determine if it is a possible false target.[2] The others are ignored.

Stalker Dual radars first screen any given fastest candidate for the possibility that it may be a false target caused by a mobile data terminal in the patrol car. The '246 radar performs no such testing. *See id.* ¶ 67.[3]

---

2. Potential causes of false target readings include mobile data terminals in the patrol car, a harmonic double of the strongest target, or a double or triple harmonic of the patrol speed. If the fastest candidate fails any one of numerous tests, it is rejected. *See id.* ¶ 81.

3. Kustom objects to paragraphs 67 through 72 of defendants' statement of facts because defendants did not specifically set forth these differences between the '246 patent and the Stalker Dual radars in the Pretrial Order. Although defendants should have at least identified the general differences in the Pretrial Order, the Court finds that Kustom was

Stalker Dual radars also screen for false fastest targets caused by strongest signals in the spectrum. In contrast, the '246 radar ignores strongest signals during a fastest search, does not have in memory the number of strongest signals in the spectrum, and does not have in memory the frequency or absolute strength of each strongest signal. The Stalker Dual has a variable gain amplifier which amplifies incoming signals by a gain level controlled by the DSP. Its knowledge of the gain level at which the samples have been take allows the Stalker Dual to calculate the true power of the frequency components in the spectrum. At a certain level of true power, any strong signal at the output of the mixer diodes in the radar receiver may generate double bounce, harmonic and intermodulation phenomena which cause false target signals. When the Stalker Dual performs a fastest search, it first performs a strongest search and saves the four strongest signals in the spectrum. Because it knows the frequency and true power of the four strongest signals, the Stalker Dual can screen each potential fastest candidate to determine if it is a false target generated by double bounce, harmonic and intermodulation phenomena. Absolute signal strength of the incoming signals cannot be known unless the gain of the preamplifier that amplified the signals is known. See id. ¶ 84. The '246 patent does not teach control of the gain of the preamplifier by the DSP or screening for intermodulation product false fastest targets. See id. ¶ 85.

Stalker Dual radars also determine whether a fastest candidate is a double or triple of the patrol speed. If it is, the Stalker Dual rejects the fastest candidate only if it has a N/S ratio which is larger than an acceptance N/S ratio selected in accordance with the true power of the patrol speed. The Stalker Dual therefore can recognize a target that is traveling the

exact speed of the patrol car or twice the exact speed of the patrol car, as long as none of the criteria of the double or triple suppression algorithm (described above) cause the candidate to be rejected. The '246 radar performs no such testing. The '246 harmonic suppression algorithm always rejects a target which is a double or triple of the patrol speed even if it is a legitimate target. See id. ¶¶ 69–71.

Stalker Dual radars screen for intermodulation products. The '246 radar does not disclose any intermodulation product screening other than the moving average examination. The Stalker Dual will not miss weak fastest targets which survive the intermodulation product testing criteria. In contrast, the '246 radar will miss any fastest target that is not strong enough to exceed the sensitivity threshold. The '246 and Stalker Dual radars therefore generate different results in many traffic situations where weak fastest targets are present. See id. ¶ 72.

With its method of processing, the '246 radar creates "blind spot" target situations. More specifically, it zeroes out certain targets which are traveling at speeds which mimic the harmonics of patrol speed or of an assumed fundamental created by fan noise. For example, the '246 radar will not display the speed of an approaching target which is traveling at exactly the speed of the patrol vehicle. If a patrol vehicle is traveling 75, and an opposite lane strongest target is traveling toward the patrol vehicle at 75, the frequency of the closing speed will be the equivalent of 150 in the spectrum generated by the FFT. The '246 patent will zero out the strongest target spectral line because it assumes that the target is a harmonic of the patrol speed signal. See id. ¶ 60.

"Look through" problems also occur in the '246 radar. If a patrol vehicle is traveling at 55, and the closest approaching

on adequate notice based on Aker's First Supplemental Expert Report and other discovery taken in the case. Moreover, the Court prefers to decide issues on the merits and counsel for defendants represents that Magistrate

Judge Rushfelt denied their request for more particularity in the Pretrial Order. Finally, even if the Court ignored these specific paragraphs, it would reach the same result.

vehicle is traveling the same speed, the '246 radar in strongest mode may "look through" that vehicle and see a more distant vehicle approaching at 70. The officer may therefore mistake the speed of the closest vehicle and the speed of the vehicle gaining behind it, creating an incorrect tracking history. If the officer's visual observation did not contradict the radar of if the officer did not make a visual observation, the 55 mph strongest target could be ticketed for traveling at 70. *See id.* ¶ 61.

Stalker Dual radars use a combination of hardware and software to avoid "blind spot" and "look through" problems with strongest targets. A serial communications link from the DSP controls antenna receiver gain, reducing it to prevent overload or increasing it to achieve maximum dynamic range. The DSP knows the antenna receiver gain, and it can compute the absolute signal strength of a given signal. Based on this computation, a software algorithm predicts a maximum absolute magnitude of the second and third harmonics of that signal. If the potential target frequency is a harmonic multiple of a strong signal frequency, the Stalker Dual will display the target if its signal strength is greater than the computed signal harmonic maximum. If the target signal strength is less than the computed signal harmonic maximum, the Stalker Dual will not indicate the potential target speed. The target display window will be blank and no alternate target will be chosen or displayed as long as the potential target is the strongest target. This feature avoids the '246 "look through" situation where an alternate target (not the closest) might be displayed as the strongest target. *See id.* ¶ 62.

Interference from the heater or air conditioner fan of the patrol car can also cause "look through" problems in the '246 radar. Such a problem might occur in stationary mode where the fan speed (as detected by the radar unit) is 10. The '246 radar will ignore a 30 mph target signal and search for a signal that is not a harmonic multiple of the fan speed. The Stalker Dual avoids this problem by displaying the 10 mph fan speed until the antenna is moved to a location where fan interference is not displayed. If the antenna is not moved, the Stalker Dual will display the speed of any target which is greater than the magnitude of the fan signal, even if the target signal is a harmonic multiple of the fan speed. *See id.* ¶ 63.

In stationary mode, Stalker Dual radars determine if a fastest candidate is moving faster than a predetermined speed. This test eliminates some sources of false fastest targets and thus achieves a different result than the '246 radar in some traffic situations. *See id.* ¶ 68.

On November 25, 1997, the PTO issued U.S. Patent No. 5,691,724 to John L. Aker. In the prosecution history of the '724 patent, defendants disclosed the '246 patent as prior art and stated that the '246 patent "[t]eaches a digital FFT based Doppler traffic radar that can selectively find either the strongest radar return signal and display the speed thereof or, upon a command from the operator, find the highest frequency Doppler radar return signal which has a nonzero amplitude and calculates and displays the speed thereof as indicative of the speed of the fastest target." Joint Exh. HH, '724 Patent Prosecution History, Information Disclosure Statement filed Aug. 8, 1996 at 2. The claims of the '724 patent read on the commercial version of the Stalker Dual radar. *See* ACI's Infr. SOF ¶ 113.

## Analysis

### I. Patent Validity

Defendants seek summary judgment declaring that the '246 patent is invalid for failure to set forth the best mode known to the inventors and for failure to distinctly define the subject matter which the inventors regarded as the invention.[4] Kustom

---

4. Defendants also argue that the '246 patent does not meet the description requirement of 35 U.S.C. § 112 ¶ 1. The Court need not address this issue because defendants failed to raise it in the *Pretrial Order* (Doc. # 105) filed

has filed a cross-motion for summary judgment on the same issues.

■ Pursuant to statute, a patent is presumed valid. *See* 35 U.S.C. § 282; *United States Gypsum Co. v. National Gypsum Co.*, 74 F.3d 1209, 1212 (Fed.Cir. 1996). In addition, each claim in a patent is presumed valid, independent of the validity of other claims in the same patent. *See* 35 U.S.C. § 282. The party challenging validity has the burden to establish by clear and convincing evidence that the patent is invalid. *See National Gypsum*, 74 F.3d at 1212.

## A. Best Mode Requirement

■ To be valid, a patent must "set forth the best mode contemplated by the inventor of carrying out his invention." 35 U.S.C. § 112 ¶ 1. The Court reviews a patent holder's compliance with this requirement as follows:

> [A] proper best mode analysis has two components. The first is whether, at the time the inventor filed his patent application, he knew of a mode of practicing his claimed invention that he considered to be better than any other. This part of the inquiry is wholly subjective, and resolves whether the inventor must disclose any facts in addition to those sufficient for enablement. If the inventor in fact contemplated such a preferred mode, the second part of the analysis compares what he knew with what he disclosed—is the disclosure adequate to enable one skilled in the art to practice the best mode or, in other words, has the inventor "concealed" his preferred mode from the "public"? Assessing the adequacy of the disclosure, as opposed to its necessity, is largely an objective inquiry that depends upon the

scope of the claimed invention and the level of skill in the art.

*Chemcast Corp. v. Arco Indus. Corp.*, 913 F.2d 923, 927–28 (Fed.Cir.1990). A patent holder's compliance with the best mode requirement is a question of fact. *See Spectra–Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524, 1535–36 (Fed.Cir.), *cert. denied*, 484 U.S. 954, 108 S.Ct. 346, 98 L.Ed.2d 372 (1987).

■ The Court first must evaluate whether as of June 30, 1994, the inventors of the '246 patent knew of a mode of practicing their claimed invention that they considered better than any other. Defendants argue that at the time the inventors knew that the best mode of the invention included an automatic range reduction ("ARR") in fastest mode and also the ability to turn off the periodic noise search ("PNS") algorithm. With respect to ARR, defendants have presented the following evidence: [5]

1. On May 13, 1994, Henderson, one of the inventors of the '246 patent, noted that the radar was revised to add ARR in fastest mode "to make unit more useful." Pl.'s Exh. 9 at 1094.

2. Henderson testified that the purpose of ARR was to prevent an officer from mistaking a closer car as the car generating the fastest target speed display when the actual fastest vehicle that was generating the displayed fastest target speed was much farther away. *See* Henderson Depo. at 76–78, 246.

3. At the time the '246 patent was filed, ARR was the chosen way to do the fastest search. Henderson testified that he would choose the method that the experienced staff at Kustom

January 5, 1999. The pretrial order supersedes all pleadings and controls the subsequent course of the case. *See* Fed.R.Civ.P. 16(e); D. Kan. Rule 16.2(c); *Hullman v. Board of Trustees of Pratt Community College*, 950 F.2d 665, 667 (10th Cir.1991).

5. Defendants also presented Kustom's Golden Eagle radar User Manual, copyright 1993,

which states that ARR "aids in proper target identification, prevents display of far distant vehicles when intended vehicle is closer to radar." *See* Defs' Exh. 404 at 7.7, 7.11. Defendants did include this reference in their statement of facts regarding the PNS algorithm, but not in connection with the ARR disclosure issue. The Court therefore disregards this reference in the ARR context.

1272

and operators told him would be "best" and that he, along with others, chose to put out a commercial radar with ARR. *See* Henderson Depo. at 247–48.

4. Henderson testified that reduction in range of the radar is one of the key elements in suppressing or eliminating the display of false targets. *See* Henderson Depo. at 300.

Kustom points out that Henderson also testified that ARR did not help screen out false fastest targets and that Kustom used ARR based on the opinion of sales and marketing employees that operators preferred the function. *See* Henderson Depo. at 246–52, 281, 337–38, 410. Henderson's testimony, when viewed in the light most favorable to Kustom, creates a factual question whether he personally considered ARR part of the best mode. On the other hand, his testimony is not so one-sided that Kustom must prevail on the issue as a matter of law. For these reasons, both motions for summary judgment with respect to validity based on the failure to disclose ARR are overruled.

Defendants also contend that the inventors of the '246 patent radar knew when they filed the patent application that the best mode of the invention included the ability to turn off the PNS algorithm. Kustom's Golden Eagle radar manual, copyright 1993, states that the fan interference filter may be turned off, apparently for those vehicles that do not generate detectable fan noise. *See* Def.'s Exh. 404 at 7.19. The fact that *Kustom* employed the ability to turn off the PNS algorithm in its commercial radar, however, is not conclusive evidence that the *inventors of the '246 patent radar* thought that the best mode included such a function. Defendants attempt to show the inventors' state of mind solely by the '246 patent, which states that the only significant tradeoff of PNS is that the radar may not recognize a target with a frequency essentially equal to one of the harmonics. *See* Joint Exh. A, Col. 9, 11 52–57; *see also* Henderson Depo. at 32–33 (PNS can eliminate actual targets if they are right on top of one of

the harmonics). The patent reference, along with the radar manual, do not show that Henderson or the other two co-inventors thought that the ability to turn off the PNS function was a better way of implementing the algorithm in the '246 patent. In fact, Henderson testified that the PNS function was the best way to decrease harmonics of fan and patrol speed. *See also* Henderson Depo. at 378. In the cited testimony, Henderson did not mention the ability to turn off the PNS function. Absent evidence that he or the other inventors thought that the ability to turn off the PNS function was part of the best mode, defendants' motion for summary judgment on the issue is overruled.

Plaintiff, however, has filed a cross motion for summary judgment on this issue. In response, defendants rely on the evidence noted above. The statements in the Golden Eagle radar manual and the '246 patent, viewed in the light most favorable to defendants, do not raise an issue of material fact regarding the inventors' knowledge that the ability to turn off the PNS function was part of the best mode. Accordingly, plaintiff's motion for summary judgment on the issue is sustained. The Court finds as a matter of law that with reference to the ability to turn off the PNS function, the '246 patent is not invalid for failure to set forth the best mode known to the inventors. The record reveals a genuine issue of material fact whether the inventors knew that the best mode of the invention included ARR in fastest mode, and neither party is entitled to summary judgment on that issue.

**B.** *Definiteness Requirement*

In addition to the best mode requirement, a patent holder must satisfy the definiteness requirement of the patent statute. The specification must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112 ¶ 2. Claim definiteness depends on "whether one

skilled in the art would understand the bounds of the claim when read in light of the specification." *Miles Labs., Inc. v. Shandon, Inc.,* 997 F.2d 870, 875 (Fed.Cir. 1993), *cert. denied,* 510 U.S. 1100, 114 S.Ct. 943, 127 L.Ed.2d 232 (1994); *see Standard Oil Co. v. American Cyanamid Co.,* 774 F.2d 448, 452 (Fed.Cir.1985) (definiteness determined in light of complete patent document). "If the claims read in light of the specification reasonably apprise those skilled in the art of the scope of the invention, § 112 demands no more." *See Miles,* 997 F.2d at 875. The purpose of the definiteness requirement is to inform the public of the scope of the patent monopoly, not to instruct how to practice the invention. *See Northern Telecom, Inc. v. Datapoint Corp.,* 1988 WL 156280, at *20 (N.D.Tex. Aug.31, 1988), *rev'd in part on other grounds,* 908 F.2d 931 (Fed.Cir.1990), *cert. denied,* 498 U.S. 920, 111 S.Ct. 296, 112 L.Ed.2d 250 (1990). The determination of claim definiteness is a question of law. *See Credle v. Bond,* 25 F.3d 1566, 1576 (Fed.Cir.1994).

■ Defendants contend that Claims 1, 16 and 20 of the '246 patent fail the definiteness requirement of 35 U.S.C. § 112 ¶ 2 because they do not include a spectrum validation function. Both plaintiff's technical expert and the inventor who designed the DSP software agree that without the spectrum validation process or some similar process, the radar will find a false fastest target most if not all of the time. The question of definiteness of the '246 patent claims turns on the Court's construction of the language in Claims 1(e), 16(d) and 20(d).

Judge O'Connor construed the term "criteria," as used in Claims 1(e), 1(f) and 16(d), as "standards used to search and find a single fastest or strongest target, depending on the mode selected by the operator." He construed the term "prese-

lected" in Claims 1(e) and 16(d) as "a selection of criteria which have been programmed into the software and cannot be altered by the operator." Judge O'Connor further noted:

> In this context, criteria cannot refer to the process of validating multiple Doppler return signals and determining their magnitude and frequency, as plaintiff argues, because no single component is identified during this process. Rather, criteria must refer to the process of searching and finding a single target for display.... [T]here must be two sets of criteria programmed into the software, only one of which will be used during a search depending on the operator's selection of fastest or strongest mode.

*Kustom,* 995 F.Supp. at 1238.

Based on the latter language, defendants contend that Claims 1, 16 and 20 omit any spectrum validation process, which is a critical element in the invention. The Court disagrees. Judge O'Connor did suggest—in dicta—that the criteria referenced in Claims 1 and 16 did not include the spectrum validation process. He did not, however, specifically construe the "search" or "searching" claim language of the '246 patent, nor did he consider how 35 U.S.C. § 112 ¶ 6 applied to such language. *See* Claims 1(e), 16(d) and 20(d). In these circumstances, the Court is not bound by Judge O'Connor's explanation as to how exactly he reached his conclusion that "criteria"—as used in Claims 1(e), 1(f) and 16(d)—means "standards used to search and find a single fastest or strongest target, depending on the mode selected by the operator."

Judge O'Connor previously set forth in detail the pertinent claim construction rules. *See Kustom,* 995 F.Supp. at 1234–35. The Court incorporates that discussion by reference.[6] In addition, Claims

---

6. Plaintiff seeks to exclude testimony of Aker which is contrary to Judge O'Connor's claim construction findings. *See Motion In Limine To Exclude Testimony Of John L. Aker Based On Claim Interpretations Contrary To This Court's Findings And Brief In Support* (Doc. # 104) filed December 30, 1998. Claim interpretation is a question of law. The Court has therefore considered Aker's claim interpretations only to help understand the police radar technology. Accordingly, plaintiff's motion in limine is overruled.

1(e), 16(d) and 20(d) of the '246 patent are written in means- or step-plus-function format. Such claim limitations must be construed "to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112 ¶ 6. The claims of the '246 patent may be construed to cover the spectrum validation process outlined in the specification if the "specification or prosecution history clearly links or associates that structure to the function recited in the claim." *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed.Cir.1997); *see General Elec. Co. v. United States*, 215 Ct.Cl. 636, 572 F.2d 745, 752 (1978) (means-plus-function elements "must be interpreted as including all disclosed elements necessary to perform the stated function").

Kustom argues that the "search" and "searching" means which are disclosed in Claims 1(e), 16(d) and 20(d) include both the spectrum validation process and the subsequent search for a single fastest or strongest target. The term "search" is commonly defined as "to look into or over carefully or thoroughly in an effort to find something." *Webster's Third New Int'l Dictionary (Unabridged)* at 2048 (1986). A careful and thorough search for a single fastest or strongest target obviously includes elimination of false targets and unwanted harmonics. *See id.* ("to look through or explore thoroughly esp. by checking on possible places of concealment or investigating circumstances possibly leading to something being overlooked"). Other than in Claims 1(e), 16(d) and 20(d), no search means is identified in the independent claims of the '246 patent. Accordingly, these claims must be construed to cover the disclosed structure for validating the frequency components.

The format of the claims, and the corresponding flow chart drawing, also support a conclusion that the spectrum validation process is part of the search and searching means of the '246 patent. Claims 1(d), 16(c) and 20(cl), which immediately precede the search and searching means claims, refer to means for storing a spectrum that includes frequency components which correspond to Doppler return signals. These claims clearly refer to Box 14 of the '246 patent flow chart titled "copy averaged spectrum." Someone of ordinary skill in the art would interpret the claims which immediately follow these claims as referring to the disclosed structure which starts in Box 15 of the '246 patent flow chart and continues in Figures 18 to 28 and 30 to 32. The structure disclosed in these figures is associated with the search and searching means of Claims 1(e), 16(d) and 20(d).

The '246 patent specification discloses a radar that performs both initial processing to qualify strongest and fastest targets and a subsequent search to identify the single fastest or strongest target. The specification discloses a number of "searches" which are conducted in the initial processing stage before the radar reads the fastest/strongest flag. *See* '246 flow chart boxes 43 ("patrol vehicle pattern search"); 57, 58 ("periodic noise search algorithm"); 73 ("harmonic search"); 132 ("patrol signature search"). Moreover, the patent specification states that an important object of the invention is "to provide a frequency spectrum containing the Doppler components which may be *examined in accordance with the operational mode selected,* and which may be processed to eliminate frequency components caused by interference or unwanted harmonics." Joint Exh. AA, Col. 2, ll 18–23 (emphasis added). Further, the specification states that "[b]y utilizing an algorithm to search and recognize this type of harmonic pattern in the frequency domain, *the DSP can effectively search the frequency spectrum,* discover and eliminate the majority of the fan caused harmonic peaks." *Id.*, Col. 9, ll 53–57 (emphasis added); *see also id.*, col. 9–10 (describes search of frequency peaks for all assumed harmonics). All of the examining, processing and searching which is disclosed in the '246 patent flow chart, after the spectrum of frequency components corresponding to Doppler return signals has been stored (except for Figures 29 and 33), is clearly linked to the function

of searching the spectrum for a single fastest or strongest target based on preselected magnitude and frequency criteria. Thus, the "search" and "searching" means in claims 1(e), 16(d), and 20(d) must cover both the initial qualification of targets and the subsequent identification of a single fastest or strongest target. *See Abbott Labs.*, 124 F.3d at 1424.

The Court agrees with Judge O'Connor's prior construction that "criteria" means "standards used to search and find a single fastest or strongest target, depending on the mode selected by the operator." The "standards" referred to in this definition include the spectrum validation process and the elimination of unwanted harmonics. In other words, some of the standards used for fastest and strongest searches are identical. Nothing in the '246 patent precludes overlap between the fastest and strongest target criteria. *Cf. Kustom*, 995 F.Supp. at 1238 ("[T]here must be two sets of criteria programmed into the software, only one of which will be used during a search depending on the operator's choice of fastest or strongest mode."). Both the initial process of qualifying the spectrum and the subsequent identification of a single target are necessary to the claimed invention. Therefore, both processes are properly included in the search and searching means of Claims 1(e), 16(d) and 20(d). *See General Electric*, 572 F.2d at 752.

Equally to the point, notwithstanding their current position on the issue, defendants have all but conceded that the independent claims of the '246 patent include the spectrum validation process. In December 1997, defendants admitted that including the spectrum validation process in claims 1(c), 16(b) and 20(b) is supported by the plain language of the claims, the specification, and the prosecution history. *See Defendants' Interpretation Of Claims 1, 16 And 20 Of The Kustom '246 Patent* (Doc. # 63) filed Dec. 10, 1997, at 2, 4, 6, 7–8 n. 1, 9–10 n. 4. Indeed, in their briefing on the infringement issue, defendants argued that differences between the Stalker Dual and the '246 patent in screening false fast-est targets caused by harmonics and inter-modulation products go to the "heart of the '246 claims" and illustrate different "search criteria" of Claims 1(e) and 16(d). *See Defendants' Reply In Support Of Its Motion For Summary Judgment On The Issue Of Doctrine Of Equivalents* (Doc. # 142) filed Apr. 7, 1999, at 10. In their briefing on the best mode requirement, defendants argue that automatic range reduction is a better way of doing a fastest search, which is clearly part of the claimed invention. *See Reply Memorandum In Support Of Defendants' Motion For Summary Judgment On The Issue Of Validity Of The '246 Patent And In Opposition To Plaintiff's Motion For Summary Judgment On The Issue Of Validity Of The '246 Patent* (Doc. # 141) filed Apr. 7, 1999, at 9–11. In drawing this conclusion, defendants refer to Figure 18 of the '246 patent flow chart which shows both reading a range sensitivity factor selected by the operator (box 15 of '246 flow chart) and the spectrum validation process of calculating a 33 point moving average (boxes 17–22). If reading the range factor is part of the claimed invention, as defendants maintain, the spectrum validation process also is included in the invention.

■ Finally, defendants claim that plaintiff is estopped from arguing that Claims 1 and 16 include the spectrum validation process because plaintiff specifically gave up the validation function during the prosecution history. The Court disagrees. First, prosecution history estoppel is pertinent only with respect to the doctrine of equivalents infringement inquiry, not to claim interpretation. *See Southwall Techs. Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1578 (Fed.Cir.) ("There is, however, a clear distinction between following the statements in the prosecution history in defining a claim term, and the doctrine of prosecution history estoppel, which limits expansion of the protection under the doctrine of equivalents when a claim has been distinguished over relevant prior art."), *cert. denied*, 516 U.S. 987, 116 S.Ct. 515,

133 L.Ed.2d 424 (1995); *Markman*, 52 F.3d at 979 (prosecution history cannot enlarge, diminish or vary claim limitation). Moreover, defendants have not shown that Kustom gave up the validation function as part of the search and searching means for finding a strongest or fastest target. The original patent application did include Claims 1(c) and 16(c), which were directed to a spectrum validation process. *See* Original Claim 1(d) ("validating said frequency components present in said spectrum by determining if each component has a greater magnitude than an average magnitude representative of the sensitivity of the spectrum"); Original Claim 16(c) ("means for determining if each of said components has a greater magnitude than an average magnitude representative of the sensitivity of the spectrum, whereby to validate those frequency components having said greater magnitude"). Issued Claims 1 and 16 did not include these clauses but they added claims which were directed to a means for searching the spectrum of frequency components for a single fastest or strongest target based on preselected criteria. Based on the meaning of issued Claims 1(e), 16(d) and 20(d), discussed above, Kustom apparently deleted the specific reference to a validation process from Claims 1 and 16 because the structure was adequately linked to the search and searching means clauses of the issued claims. Regardless of Kustom's reason, however, it did not make specific statements regarding the meaning of the search means in the claims of the patent. Accordingly, prosecution history estoppel does not bar Kustom from asserting that the spectrum validation process remains in the issued claims of the '246 patent.

Based on the above construction of the search and searching means in Claims 1(e), 16(d) and 20(d), Kustom disclosed the spectrum validation process in the '246 patent. Kustom has claimed an operable invention and satisfied the definiteness requirement of 35 U.S.C. § 112 ¶ 2 as a matter of law. Defendants' motion for summary judgment on the issue is therefore overruled. Given that plaintiff has satisfied the definiteness requirement as a matter of law, plaintiff's cross motion for summary judgment on the issue is sustained. The Court determines as a matter of law that the '246 patent is not invalid for failure to distinctly define the subject matter which the inventors regarded as the invention.

## II. Infringement—Doctrine Of Equivalents.

The Court held previously that the Stalker Dual radars do not literally infringe any of the independent claims of the '246 patent. *See Kustom*, 995 F.Supp. at 1239–40. That determination is the law of the case and the Court declines plaintiff's request to revisit the issue.[7] Plaintiff argues that the Court relied upon erroneous factual findings in its prior holding that the Stalker Dual radars did not literally infringe the '246 patent. The Court based its findings, however, on statements of fact which plaintiff either admitted or did not dispute. Plaintiff cannot now claim that those findings were erroneous.[8]

7. Because the Court has already decided the issue, defendants seek to exclude expert testimony of Thomas J. Herrick which relates to defendants' infringement of the selective display element of the '246 patent. *See Motion In Limine: Expert Testimony* (Doc. # 100) filed December 30, 1998. The Court has held that the selective display element was not literally met by the Stalker Dual radars, but it did not decide whether the Stalker Dual radars contained an equivalent element. *See Kustom*, 995 F.Supp. at 1239–40. Accordingly, the Court has considered Herrick's opinions only to the extent they relate to infringement under the doctrine of equivalents. Defendants' motion to exclude Herrick's opinions is overruled.

8. Defendants ask the Court to strike plaintiff's expert reports, to the extent that they cover the literal infringement issue. Given the substantial overlap between the two infringement inquiries, the Court has considered plaintiff's expert reports—but only to the extent that they address infringement under the doctrine of equivalents.

Even if an accused device does not literally satisfy all of the limitations of a patent, however, infringement may be found under the doctrine of equivalents. *See Warner–Jenkinson Co., Inc. v. Hilton–Davis Chem. Co.,* 520 U.S. 17, 29–30, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997), *rev'g,* 62 F.3d 1512, 1517 (Fed.Cir.1995). The doctrine of equivalents rests on the rationale that limiting enforcement of patent rights to literal infringement may be harsh in some circumstances and "would place the inventor at the mercy of verbalism." *Warner–Jenkinson,* 62 F.3d at 1517 (quoting *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 607, 70 S.Ct. 854, 94 L.Ed. 1097 (1950)).

Judge O'Connor denied defendants' original motion for summary judgment on infringement under the doctrine of equivalents:

> Here, defendants have failed to establish as a matter of law that its Stalker Dual radars do not infringe claims 1, 16, and 20 of the '246 patent under the doctrine of equivalents. Although we held above that the '246 patent does not read exactly on defendants' Stalker Dual radars, we cannot conclude that the differences between the elements of the Kustom and Stalker Dual radars are not "insubstantial" as a matter of law. Based on the conflicting evidence presented by the parties, particularly the experts' reports and testimony presented by the parties, there remains an issue of fact as to whether the Stalker Dual radars perform substantially the same functions in substantially the same ways to achieve substantially the same results as the Kustom radar.
>
> The court notes that evidence of the known interchangeability of the Stalker Dual radars' element of searching and displaying both the fastest and strongest targets with the element of the '246 patent of searching and displaying either the fastest or strongest target may be important in determining whether defendants' Stalker Dual radars infringe plaintiff's patent. Moreover, the court notes that the doctrine of equivalents cannot be used to erase "meaningful structural and functional limitations of the claim[s]" in the '246 patent. *Sage Prods., Inc. v. Devon Indus., Inc.,* 126 F.3d 1420, 1425 (Fed.Cir.1997). At this point, given the limited briefing on the issue and the remaining disputed factual issues, the court cannot conclude as a matter of law whether application of the doctrine of equivalents to defendants' Stalker Dual radars would erase functional limitations of the '246 patent or merely combine two separate elements already disclosed in the '246 patent, *i.e.,* fastest and strongest searches.
>
> Defendant has pointed to a number of differences between the Stalker Dual radars and the '246 patent. For example, defendants argue that the Stalker Dual radars can perform both a fastest and strongest target search and display from the same set of data while the '246 patent must collect a new set of data if the operator wishes to change modes. Although this may be a difference, there is a factual dispute as to whether this difference is substantial for purposes of the doctrine of equivalents analysis. The factual record is not so one-sided that the court can resolve the issue as a matter of law. *See Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505.

*Kustom,* 995 F.Supp. at 1240–41.

As an initial matter, plaintiff requests reconsideration of Judge O'Connor's construction of the term "or" in the '246 patent. Judge O'Connor defined "or" as "a choice between either one of two alternatives, but not both." The Court adheres to this definition, which is consistent with the ordinary meaning of the term, the language of the claims, the specification, and the prosecution history. *See Kustom,* 995 F.Supp. at 1236–37 (D.Kan.1998). Moreover, the notice function of patents is best served by the definition. *See id.* at 1237 (quoting *Athletic Alternatives, Inc. v. Prince Mfg., Inc.,* 73 F.3d 1573, 1581 (Fed. Cir.1996)). Finally, plaintiff has not satisfied the standards for reconsideration of a prior ruling. Plaintiff has not shown an

intervening change in controlling law, availability of new evidence or the need to correct clear error or prevent manifest injustice. *See Shinwari v. Raytheon Aircraft Co.*, 25 F.Supp.2d 1206, 1208 (D.Kan. 1998). Plaintiff's request for reconsideration also is untimely pursuant to D. Kan. Rule 7.3(b) because it was not filed within ten days of the entry of the order.

In determining whether defendants have infringed the '246 patent, the Court first notes that after the '246 patent was issued, Aker obtained a patent which covered the accused Stalker Dual radars. *See* Joint Exh. II, U.S. Patent No. 5,691,724 (the "'724 patent"). In the prosecution history of the '724 patent, defendants specifically disclosed the '246 patent as prior art and stated that the '246 patent "[t]eaches a digital FFT based Doppler traffic radar that can selectively find either the strongest radar return signal and display the speed thereof or, upon a command from the operator, finds the highest frequency Doppler radar return signal which has a nonzero amplitude and calculates and displays the speed thereof as indicative of the speed of the fastest target." Joint Exh. HH, '724 Patent Prosecution History, Information Disclosure Statement filed Aug. 8, 1996, at 2. Nevertheless, the PTO issued Aker a patent. Though not conclusive, the issuance of the '724 patent after disclosure of the '246 patent as prior art is entitled to due weight in determining whether defendants' Stalker Dual radar infringes the '246 patent. *See Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563, 1570 (Fed.Cir.1996); *National Presto Indus., Inc. v. West Bend Co.*, 76 F.3d 1185, 1191–92 (Fed.Cir.1996).

 In addition to showing that the '246 radar and the Stalker Dual radar are equivalent in fact, Kustom must clear three preliminary legal hurdles. First, the doctrine of equivalents may not be invoked unless the all-elements (or all-limitations)

rule is satisfied, *i.e.* every claimed element or its equivalent must be contained in the accused device. *See Warner–Jenkinson*, 520 U.S. at 39 n. 8, 117 S.Ct. 1040; *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 172 F.3d 1361, 1370 (Fed.Cir. 1999); *Ethicon*, 149 F.3d at 1316. Second, prosecution history estoppel may bar a patent holder who limits one of its claims to avoid rejection by the PTO and then seeks to expand the claims under the doctrine of equivalents to include the subject matter previously excluded. *See Warner–Jenkinson*, 520 U.S. at 39 n. 8, 117 S.Ct. 1040; *Festo*, 172 F.3d at 1371–74. Third, the doctrine of equivalents cannot be used to encompass subject matter that the patent holder could not have patented at the time of the original patent application, *i.e.* the range of equivalents cannot be so broad as to ensnare the prior art. *See Wilson Sporting Goods Co. v. David Geoffrey & Assocs.*, 904 F.2d 677, 683 (Fed. Cir.), *cert. denied*, 498 U.S. 992, 111 S.Ct. 537, 112 L.Ed.2d 547 (1990). In the instant motions, defendants have raised the first and third grounds as a legal bar to a finding of infringement under the doctrine of equivalents.[9]

### A. All–Elements Rule

 The purpose of the all-elements rule is to ensure that the doctrine of equivalents "is not allowed such broad play as to effectively eliminate [an] element [of a claim] in its entirety." *Warner–Jenkinson*, 520 U.S. at 29, 117 S.Ct. 1040; *see Sage*, 126 F.3d at 1425 (doctrine of equivalents cannot erase meaningful structural and functional limitations); *Conopco, Inc. v. May Dep't Stores Co.*, 46 F.3d 1556, 1562 (Fed.Cir.1994) (same), *cert. denied*, 514 U.S. 1078, 115 S.Ct. 1724, 131 L.Ed.2d 582 (1995). Although the accused device must contain every element or its equivalent, each element need not be present in a corresponding component, although that is

---

9. Defendants previously raised the defense of prosecution history estoppel but Judge O'Connor rejected it. *See Kustom*, 995 F.Supp. at 1241. Defendants have not reasserted the defense in the instant motions. Plaintiff's *Motion In Limine to Exclude Evidence And Testimony Regarding Doctrine Of Prosecution History Estoppel And Brief In Support* (Doc. # 103) filed December 30, 1998, is therefore moot.

often the case. *See Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1259 (Fed.Cir.1989). In other words, "the doctrine of equivalents does not require a one-to-one correspondence between the accused device and that disclosed in the patent." *Intel v. United States Int'l Trade Comm'n*, 946 F.2d 821, 832 (Fed.Cir.1991). Elements of the patented invention may be combined in some circumstances without loss of equivalency. *See Sun Studs, Inc. v. ATA Equip. Leasing Inc.*, 872 F.2d 978, 989 (Fed.Cir.1989), *overruled on other grounds, A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1038–39 (Fed.Cir.1992).

■ Every element of a claim is considered meaningful and essential. *See Warner–Jenkinson*, 520 U.S. at 29, 117 S.Ct. 1040; *Pennwalt*, 833 F.2d at 935. One of the elements of Claims 1, 16 and 20 is that the radar searches and displays either the strongest or fastest target but not both. *See* Claims 1(e), 1(f), 16(d), 16(e), 20(d), and 20(e); *Kustom*, 995 F.Supp. at 1236 ("or" means "a choice between either one of two alternatives, but not both"). This selective display element, or its equivalent, is absent from the Stalker Dual radar—which is capable of searching and displaying both the strongest and fastest targets based on the same set of data. To find the Stalker Dual radar equivalent to the claimed invention would eliminate the "or" element of Claims 1, 16 and 20. *See Warner–Jenkinson*, 520 U.S. at 29, 117 S.Ct. 1040; *Wiener v. NEC Elects., Inc.*, 102 F.3d 534, 541 (Fed.Cir. 1996) (doctrine cannot embrace · matter specifically excluded by claims); *Dolly, Inc. v. Spalding & Evenflo Cos., Inc.*, 16 F.3d 394, 398 (Fed.Cir.1994) (doctrine of equivalents not a license to ignore claim limitations). The Federal Circuit has held:

> [A]ny analysis of infringement under the doctrine of equivalents necessarily deals with subject matter that is "beyond," "ignored" by, and not included in the literal scope of a claim. Such subject matter is not necessarily "specifically excluded" from coverage under the doctrine *unless its inclusion is somehow* inconsistent with the language of the claim. Literal failure to meet a claim limitation does not necessarily amount to "specific exclusion."

*Ethicon Endo–Surgery v. United States Surgical Corp.*, 149 F.3d 1309, 1317 (Fed. Cir.1998) (emphasis added). The Stalker Dual radar, which provides for search and display of both strongest and fastest targets, is inconsistent with the '246 patent claims which disclose a radar that can search and display either strongest or fastest targets but not both. *See id.; Wiener*, 102 F.3d at 541 (equivalency cannot embrace structure specifically excluded from claims); *Dolly*, 16 F.3d at 400 (same).

■ Plaintiff argues that at a minimum, the Stalker Dual radar infringes in strongest mode because only the strongest target is displayed. The Federal Circuit has held that if an accused device uses the claimed method even part of the time, it infringes. *See Bell Communications Res. v. Inc. Vitalink Communications Corp.*, 55 F.3d 615, 622–23 (Fed.Cir.1995). Plaintiff attempts to dissect the selective element of the '246 patent so that an accused radar which displays only the strongest target is equivalent regardless of its further capability of displaying the fastest target. Plaintiff's claimed method essentially contains two limitations—(1) display of strongest target only and (2) display of fastest target only. The Stalker Dual radar never uses the method of Claims 1, 16 and 20 because it is unable to display the fastest target without also displaying the strongest target. *See Perkin–Elmer*, 822 F.2d at 1532 (court should not convert multi-limitation claim to one of two limitations to find equivalency). Moreover, as noted above, the Stalker Dual radar has the capability of searching and displaying both fastest and strongest targets—a capability which is inconsistent with and excluded by the selective display element of the '246 patent.

Kustom argues that the Stalker Dual radars infringe in fastest mode when the strongest target is equal to the fastest target. In this situation, Kustom main-

tains that the Stalker Dual radars meet the selective display element because the radar displays only a single target. In making this argument, Kustom ignores the fact that the speed displayed is that of the strongest target, not the fastest target. The speed is shown in the strongest target window and the audio heard by the operator corresponds to the strongest target. Moreover, a fastest target, as defined by the source code of the Stalker Dual radars, must be at least one unit greater than the displayed strongest speed or the fastest speed will not be displayed. In addition, a fastest target will not be displayed unless a qualified strongest target is displayed. In Kustom's hypothetical scenario, no fastest target is identified or displayed. Accordingly, Kustom has not shown that the Stalker Dual radars display the fastest target without also displaying the strongest target.

Kustom next contends that the '246 patent is a "pioneer invention" because it was the first DSP radar which determined and displayed the speed of a fastest target vehicle even if that vehicle did not have the strongest radar return signal. A pioneer invention is defined as "a function never before performed, a wholly novel device, or one of such novelty and importance as to mark a distinct step in the progress of the art, as distinguished from a mere improvement or perfection of what had gone before." *Boyden Power Brake Co. v. Westinghouse*, 170 U.S. 537, 561–62, 18 S.Ct. 707, 42 L.Ed. 1136 (1898). Whether the '246 patent enjoys pioneer status depends on the disputed factual question whether defendants' Stalker Dual radar is part of the prior art. *See infra*, Section II. B., Prior Art As Limit To Range Of Equivalents; *Stairmaster Sports/Med. Prods., Inc. v. Groupe Procy-*

cle, *Inc.*, 25 F.Supp.2d 270, 284–85 (D.Del. 1998) (pioneer status is question of fact). This factual dispute does not preclude summary judgment, however, because plaintiff has not satisfied the all-elements rule. Although a broader range of equivalents is available to pioneer inventions, the accused device still must contain every element of the claimed invention or its equivalent. *See Warner–Jenkinson*, 520 U.S. at 29, 117 S.Ct. 1040 (doctrine of equivalents cannot eliminate an element of a claim in its entirety); *see also Texas Instruments, Inc. v. United States Int'l Trade Comm'n*, 846 F.2d 1369, 1370 (Fed.Cir.1988) (pioneer status "does not change the way infringement is determined"). An accused device is not equivalent to a pioneer invention if it contains matter specifically excluded by an element of the patented invention. In addition, the selective display element of the '246 patent is not directly related to its alleged pioneer status, *i.e.* finding a fastest target vehicle even if the vehicle does not have the strongest return signal.

For the above reasons, the Court concludes that Kustom has failed to satisfy the all-elements rule. A finding that the Stalker Dual radars infringe the '246 patent under the doctrine of equivalents is therefore precluded as a matter of law.

**B.** *Prior Art As Limit To Range Of Equivalents*

Defendants maintain that Kustom cannot invoke the doctrine of equivalents to cover the Stalker Dual radar because its invention also would cover prior art. Kustom bears the burden to prove that the range of equivalents which it seeks would not encompass prior art.[10] *See Wilson*, 904 F.2d at 685. Defendants have the initial burden, however, of proving that a

10. Kustom apparently contends that the Stalker Dual radars infringe under the doctrine of equivalents because hypothetical claims can be constructed that are allowable over the prior art and literally cover the Stalker Dual in fastest mode. *See Memorandum In Support Of Plaintiff's Motion For Summary Judgment Of Infringement Of U.S. Patent No.*

*5,528,246* (Doc. # 123) filed Mar. 1, 1999, at 45–46. The hypothetical claim analysis, however, only determines if prior art is a legal bar to a finding of infringement under the doctrine of equivalents. *See Wilson*, 904 F.2d at 684. A finding of infringement is not required if plaintiff clears this preliminary hurdle.

particular device is part of the prior art. *See Streamfeeder, LLC v. Sure–Feed Sys., Inc.*, 175 F.3d 974, 983 (Fed.Cir.1999). Defendants contend that from 1992 to 1994, the Police Department of Parker, Texas used a version of the Stalker Dual radar, the "29F radar," and that this device should be considered prior art. Plaintiff has presented sufficient evidence to create an issue of material fact on this point. First, in 1998, John Kusek, Kustom's CEO, operated the department's only Stalker Dual radar and it did not have fastest capability at that time. Moreover, the only contemporaneous documentation is the source code of the 29F radar. The source code, standing alone, does not establish that such a radar was built or used in 1992. Finally, all of the testimony regarding the use of the 29F radar is from interested parties. Based on the present record, defendants have not shown that Kustom's proposed range of equivalents is so broad to encompass prior art.

## C. *Equivalency In Fact*

Even if plaintiff could satisfy the all-elements rule, the Court finds that no reasonable trier of fact could find that the Stalker Dual radar is equivalent in fact to the '246 radar.[11] To prevail on a claim of infringement under the doctrine of equivalents, a patentee must prove by a preponderance of the evidence that "the differences between the claimed and accused products or processes are insubstantial." *Warner–Jenkinson*, 62 F.3d at 1517. The Court assesses the substantiality of the differences between two products "according to an objective standard" viewed from "the vantage point of one of ordinary skill in the relevant art." *Id.* at 1519. The doctrine of equivalents is applied on an element-by-element basis, not to the invention as a whole. *See Warner–Jenkinson*, 520 U.S. at 29, 117 S.Ct. 1040.

The traditional measure of equivalency is the "function-way-result" test.[12] *See Warner–Jenkinson*, 62 F.3d at 1518–21. It focuses on whether an element of an accused device performs substantially the same function in substantially the same way to achieve substantially the same result as each element of the claimed device. *See id.* at 1518. The Federal Circuit has noted other relevant inquiries. For example, the substantiality of differences may be measured by "whether persons reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent with one that was." *Id.* at 1518; *see Warner–Jenkinson*, 520 U.S. at 36, 117 S.Ct. 1040; *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1261 (Fed.Cir.1989). "Known interchangeability" of an element in the accused device with a claimed element is "potent evidence that one of ordinary skill in the relevant art would have considered the change insubstantial." *Warner–Jenkinson*, 62 F.3d at 1519. Known interchangeability is evaluated at the time of infringement, not at the time the patent was issued. *See Warner–Jenkinson*, 520 U.S. at 37, 117 S.Ct. 1040.

As discussed with respect to the all-elements rule, the Stalker Dual and '246 radars do not perform substantially the same functions.[13] The Stalker Dual radar is

11. The test for compliance with the all-elements rule, which is a question of law, can overlap to a substantial degree with the test for equivalency in fact. The Federal Circuit, however, treats the two questions as separate inquiries. *See Festo,* 172 F.3d at 1370.

12. Kustom suggests that the function-way-result test may provide a poor framework to analyze police traffic radars and other inquiries should be considered. *See Memorandum In Opposition To Defendants' Motion For Summary Judgment On The Issue Of Infringement Of The '246 Patent* (Doc. # 131) filed Mar. 24, 1999, at 48 n. 3. Other than "known interchangeability," Kustom fails to identify any such inquiries.

13. Defendants move to strike the expert report of Gregory Upchurch because plaintiff did not timely disclose him as an expert. *See Defendants' Motion To Exclude Testimony Of Expert Gregory Upchurch* (Doc. # 87) filed November 18, 1998. Plaintiff designated Upchurch as a rebuttal expert and served his report on October 28, 1998. Defendants argue that Upchurch is actually a new liability expert and should have been timely designat-

capable of displaying both fastest and strongest targets based on the same set of data while the '246 radar selectively displays either fastest or strongest targets but not both. Accordingly, the two radars perform substantially different functions which produce different displays to the radar operator.

Despite the complexity of the overall device, the selective display element of the '246 patent is relatively simple—either A or B, but not both. Plaintiff has not shown any "subtlety of language or complexity of the technology, nor any subsequent change in the state of the art, such as later-developed technology, [which] obfuscated the significance of this limitation at the time of its incorporation into the claim." *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1425 (Fed.Cir.1997); *see Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 938 (Fed.Cir.1987), *cert. denied*, 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988). The change from a radar device that could perform either A or B but not both to a radar that could perform A and B involved the mere addition of a "link." *See Declaration of Thomas J. Herrick* (Doc. # 124) filed Mar. 1, 1999 at 25. Plaintiff could have foreseen the alteration of the patented invention from "or" to "and." Indeed, plaintiff claims that it intended to patent a fastest feature that would display the fastest target "either in lieu of the strongest target vehicle or in addition to the strongest vehicle's speed." Kusek Depo. at 25–28; *see Memorandum In Support Of Plaintiff's Motion For Summary Judgment Of Infringement Of U.S. Patent No. 5,528,246* (Doc. # 123) filed Mar. 1, 1999 at 44 (Stalker Dual in fastest mode merely combines known strongest function with

known fastest function). Despite plaintiff's apparent attempt to draft an "and/or" claim, plaintiff must accept the limited "or" claim it obtained from the PTO. "[A]s between the patentee who had a clear opportunity to negotiate broader claims but did not do so, and the public at large, it is the patentee who must bear the cost of its failure to seek protection for this foreseeable alteration of its claimed structure." *Sage*, 126 F.3d at 1425.

In addition to the different displays of the two radars, the radars calculate target speeds in substantially different ways which produces substantially different results.[14] As explained in detail in the Factual Background, *supra*, section E, the Stalker Dual radars eliminate false targets and unwanted harmonics in substantially different ways to achieve substantially different displayed target speeds. In some circumstances, the Stalker Dual radar will not display any target while the '246 radar may display a false target. In other situations, the Stalker Dual radar conducts different processing of the FFT spectrum to avoid "look through" and "blind spot" problems present in the '246 radar. Even if the '246 invention is considered a "pioneer invention," no reasonable trier of fact could find that the differences between the two radars are insubstantial.

Kustom essentially concedes that the two radars calculate target speeds in substantially different ways to produce different results. Kustom argues, however, that these differences in the Stalker Dual radar merely reflect additional functions to those performed by the '246 radar. One of the purposes of the '246 patent is to provide a radar that "improve[s] target identification and minimize[s] interference and unwanted

---

ed as such. Although only a portion of his expert report rebuts defendants' expert reports, the Court has considered it because defendants had ample opportunity to respond. The Court also rejects defendants' contention that the report is not helpful. Upchurch is skilled in the relevant art and his testimony would assist the trier of fact determine the substantiality of differences between the two

radars. Defendants' motion is therefore overruled.

**14.** This difference alone may be insufficient to warrant summary judgment in favor of defendants, but when combined with the different display capabilities discussed above, the Court finds that no reasonable trier of fact could find that the differences between the two radars are insubstantial.

harmonics." Joint Exh. AA, Col. 1, ll 11–13. Moreover, the "search" and "searching" means of 1(e), 16(d) and 20(d) include the spectrum validation process disclosed in the '246 flow chart. Kustom cannot argue that the validation of targets is part of the claims for validity purposes but not part of the claims for infringement purposes. The differences in the calculation and display of target speeds relate to the "search" and "searching" means of the independent claims of the '246 patent. ACI has not simply added to the spectrum validation process disclosed in the '246 patent, it has produced a radar with a substantially different validation process which produces different results for the operator.

Finally, the Court evaluates the known interchangeability of the Stalker Dual and '246 radars. Kustom has not presented any evidence that those of ordinary skill in the art knew that the Stalker Dual's spectrum validation process was interchangeable with the '246 radar's spectrum validation process. With respect to the selective display element of the '246 patent, Kustom maintains that dual display capability is disclosed in the '246 patent because each individual display is shown in the patent. The Court already held that the '246 patent does not disclose dual display of fastest and strongest targets based on the same set of data. Kustom has not presented any evidence regarding the complexity of the "link" technology to combine fastest and strongest target displays. To the extent such technology existed at the time of the '246 patent application, as Kustom apparently argues, Kustom should have drafted a broader claim to include this technology.

For the above reasons, the Court finds that Kustom's claim of infringement under the doctrine of equivalents is barred by the all-elements rule and that no reasonable trier of fact could find that the Stalker Dual radars are equivalent in fact to the '246 patent.

In sum, the Court has previously held that defendants did not literally infringe the '246 patent. See Kustom, 995 F.Supp.

at 1239–40. The Court finds as a matter of law that the Stalker Dual radars do not infringe the '246 patent under the doctrine of equivalents. It therefore sustains defendants' motion for summary judgment of non-infringement of the '246 patent under the doctrine of equivalents and overrules plaintiff's motion on the issue.

The Court also finds as a matter of law that with reference to the ability to turn off the PNS function, the '246 patent is not invalid for failure to set forth the best mode known to the inventors, or for failure to distinctly define the subject matter which the inventors regarded as the invention. The Court therefore sustains plaintiff's motion for summary judgment on these claims. The record reveals a genuine issue of material fact whether the inventors knew that the best mode of the invention included ARR in fastest mode, and neither party is entitled to summary judgment on that issue. Accordingly, the trial will determine whether the '246 patent is invalid for failure to set forth best mode known to the inventors with respect to automatic range reduction. The pretrial order identifies several other validity defenses which remain for trial, *i.e.* anticipation and obviousness of the '246 patent based on prior act.

**IT IS THEREFORE ORDERED** that *Defendants' Motion For Summary Judgment On The Issue Of Validity Of The '246 Patent* (Doc. # 116) filed February 26, 1999, be and hereby is **OVERRULED.**

**IT IS FURTHER ORDERED** that *Defendants' Motion For Summary Judgment On The Issue Of Infringement Of The '246 Patent* (Doc. # 119) filed February 26, 1999, be and hereby is **SUSTAINED.**

**IT IS FURTHER ORDERED** that *Plaintiff's Motion For Summary Judgment Of Infringement Of U.S. Patent No. 5,528,246* (Doc. # 122) filed March 1, 1999, be and hereby is **OVERRULED.**

IT IS FURTHER ORDERED that *Plaintiff's Cross Motion For Summary Judgment Of Validity Of The '246 Patent* (Doc. # 130) filed March 24, 1999, be and hereby is **SUSTAINED in part and OVERRULED in part.**

IT IS FURTHER ORDERED that *Defendants' Motion To Exclude Testimony Of Expert Gregory Upchurch* (Doc. # 87) filed November 18, 1998, be and hereby is **OVERRULED.**

IT IS FURTHER ORDERED that defendants' *Motion In Limine: Expert Testimony* (Doc. # 100) filed December 30, 1998, be and hereby is **OVERRULED.**

IT IS FURTHER ORDERED that plaintiff's *Motion In Limine to Exclude Evidence And Testimony Regarding Doctrine Of Prosecution History Estoppel And Brief In Support* (Doc. # 103) filed December 30, 1998, be and hereby is **OVERRULED as moot.**

IT IS FURTHER ORDERED that plaintiff's *Motion In Limine To Exclude Testimony Of John L. Aker Based On Claim Interpretations Contrary To This Court's Findings And Brief In Support* (Doc. # 104) filed December 30, 1998, be and hereby is **OVERRULED.**